DALE B. WOLFE, Plaintiff and Appellant, v. NORTH-
ERN PACIFIC RAILWAY CO., Defendant and Respon-
dent and Third-Party Plaintiff, v. FARMERS UNION
CENTRAL EXCHANGE, INC., a corporation, Third-
Party Defendant.

No. 10895.
Submitted November 5, 1965. Decided January 11, 1966.
409 P.2d 528.

See **C. J. S.**, Discovery, § 68.

Dale F. Galles, Billings, John B. Halloran (argued), Minneapolis, Minn., for appellant.

Lamey, Crowley, Kilbourne, Haughey & Hanson, Bruce R. Toole (argued), Jones & Olsen, Paul G. Olsen (argued), Billings, for respondent.

MR. JUSTICE JOHN C. HARRISON delivered the Opinion of the Court.

Appellant, Dale B. Wolfe, asks review of the proceedings in the district court of the thirteenth judicial district, Yellowstone County, the Honorable E. E. Fenton, Judge presiding, wherein a jury verdict and judgment thereon denied him relief in his action for personal injuries brought against respondent, Northern Pacific Railway Company, which interpleaded Farmers Union Central Exchange, Inc., as a third-party defendant. He asserts prejudicial error in the proceedings when the court (a) admitted testimony of witnesses, the identity and location of whom the respondent failed to disclose in answer to his interrogatories; (b) allowed the jury to view a certain exhibit of railroad wheels on rails which was not offered into evidence and which he claims was not relevant to the factual issues in dispute; and (c) denied his motion to vacate and set aside the verdict and to grant a new trial on grounds that the verdict was not justified by the evidence and was against the law.

As a switchman for the respondent railroad, Mr. Wolfe was working on a crew switching oil tank cars at the Farmers Union Central Exchange refinery located in Laurel, Montana, during the early daylight morning hours of October 7, 1962. It was his duty to make certain that the cars to be pulled out were properly coupled. After giving the appropriate signals that the coupling was completed, he gave the signal to the engineer to take the cars out. He alleges that as he attempted to mount the train to ride out with the cars according to the custom and practice of switchmen, his left foot slipped in oil or grease on the concrete walkway, and as he tried to catch himself, his right foot slipped in the oily substances pitching him forward and down between the cars. He alleges he landed on his stomach with his left hand, palm down, on the rail. One wheel of the following car, he claims, ran over the back of his hand crushing the bones in the end of his left thumb and severely lacerating and bruising the muscles and other tissues of the hand. When asked by his own counsel, "Did the wheel of one of the cars run over your hand?," he answered, "One car passed over my hand." This was stated more emphatically during examination by opposing counsel when he stated that the wheel went "right straight across the back of my hand." When asked by his own counsel if he could show the jury how his hand lit on the rail, he laid his mitten across the bar in front of the witness stand. His counsel then queried, "Mr. Wolfe, assuming this railing is approximately the same width of a rail—we don't know—is your glove or Exhibit 9 placed on the railing in this courtroom in the same manner as the mitten was at the time that the wheel ran over it with your hand in it?" He replied, "In approximately this same position. I can't be just positive, you understand, when this happened it was so quick, that it's all one motion and as far as pinpointing this as to the exact position, it would be almost an impossibility." He then proceeded, upon inquiry by his counsel, to indicate to the jury how the wheel passed over his hand by pointing to certain creases on the mitten purportedly the marks of the wheel and

the flange. When asked if more than one wheel passed over his hand, he answered, "No." He was then asked, "how did you happen to get your hand away to prevent the second wheel of the first set of trucks running over you hand?" He said, "Well just the minute the wheel hit my hand why you involuntarily jerk and I jerked my hand out of my mitten." Mr. Wolfe asked damages of $200,000 for injuries to the hand.

Medical testimony indicated that it was questionable whether Mr. Wolfe would ever be able to use his left hand to that degree necessary to perform the labor of a switchman. Although the end of the thumb is now non-functional, it was the opinion of the doctors who had examined and treated the hand that either arthrodesis (fusion) of the remaining end bone with that bone of the thumb presently functional or amputation of the non-functional bone, would give him greater use of his thumb.

Mr. Wolfe filed his complaint June 10, 1963, under the Federal Employers' Liability Act, 45 U.S.C. § 51 et seq., alleging that the respondent railroad failed to provide him with a reasonably safe place to work. After its motion to dismiss was refused, the respondent filed an answer denying that it failed to provide a reasonably safe place for Mr. Wolfe to work, and also set up the defense of contributory negligence. At the same time, respondent filed a third party complaint against the Farmers Union Central Exchange, Inc., alleging negligence on the part of the refinery in permitting accumulation of oily materials on the walkway where Mr. Wolfe had to work and pleading an indemnity agreement between it and the refinery for all losses, damages or injuries caused the respondent by any act or omission of the refinery. A motion to dismiss or in the alternative for summary judgment by the refinery was refused. In its answer the refinery denied liability, but asked that if it were found to have been under a duty to have kept the premises clean, and to have breached that duty, it would further be found that the damages were the result of a joint and concur-

ring negligence which by the indemnity agreement was to be borne by both negligent parties equally.

The issues between the respondent railroad and the refinery on the indemnity agreement were by stipulation to be tried before the court without a jury. However, it was agreed by all parties that the issue of the refinery's negligence was for the jury's consideration, inasmuch as the ultimate questions to be tried were whether the appellant was injured in the manner he alleged in his complaint and whether the proximate cause of the injury resulted from negligence of either the refinery or the respondent, or both. Thus, the condition of the premises at the time of the injury was declared to be the major issue when the trial began. On that matter the refinery could properly examine the witnesses and produce evidence for the jury.

On September 20, 1963, the appellant served written interrogatories upon the respondent railway company requesting the following information:

1. State the name, age, address, occupation and place of employment, and if employed by defendant, length of service for defendant, of every person known to the defendant, its agents, servants and employees, having knowledge of any relevant facts pertaining to the above entitled action.

2. State the name, age, address, occupation and place of employment of every person interviewed by you, or on your behalf, in regard to the above entitled action, and the date and place of such interviews.

3. State the name, last-known addresses, places of employment, job classification and present whereabouts of all agents, servants, employees, representatives, private investigators or others who investigated this accident on behalf of the defendant.

T. J. Clark, claim agent for the respondent, submitted answers on December 30, 1963. By written notification these interrogatories were made "continuing," and "supplemental answers" were required if respondent, "directly or indirectly," obtained names of persons possessed of relevant facts, persons

who were interviewed, or persons who investigated the accident "Between the time answers are served and the time of the trial."

Trial of the case commenced March 30, 1964. The appellant rested on April 6, 1964, after a thorough and detailed presentation of his case. Then before the defense began calling witnesses, Mr. Toole, counsel for the respondent railroad made the following statement: "I want to make a short statement about the application, this is a somewhat anomalous situation, three-corner lawsuit we have going on here. Some of these witnesses, particularly those pertaining to cleanliness of the refinery, are going to be interrogated by Mr. Olsen (counsel for the refinery) because he had talked to them and is familiar with their testimony. Now this obviously has a bearing on the position of the Railway Company in the case and I would like to have it understood that the testimony of these refinery witnesses pertaining to cleanliness and accident records and the like pertain to the defense of the Railway Company and not just on the action between Mr. Olsen and myself. In other words, Mr. Olsen in effect will be interrogating these witnesses for the Railway Company, although he may have some points of his own that he will want to develop on the matter between us, I don't see any complication except I would like to have that understood."

After hearing that statement Mr. Halloran, counsel for the appellant, asked for further clarification: "Well, if the Court please, I don't know if I thoroughly understand just what was proposed here, but I think the Jury should be informed, at least in view of the preliminary statements, that any condition proposed to be shown relative to the area in the Farmer's Union, while it may relate to the issue that (is to be) determined by the court between the Railroad and the Farmer's Union, that the Jury should be informed at this time that any evidence of the condition so far as the Defendant Farmer's Union is concerned, in any defective or dangerous or negligent condition, is the negligence of the railroad."

Mr. Toole further remarked, "Your Honor, I agree with Mr. Halloran's general statement. It seems to me that the jury can be adequately instructed on that and we are not arguing with the principle that the Railway Company has an undelegable duty to provide a safe place to work and if we chose to rely on others to do that, that is our responsibility to answer for their failure; is that the principle that you wish expressed?"

Said Mr. Halloran, "Yes."

With the posture of the case at this time thus understood by court, counsel, and jury, the refinery called Mr. Huntington, its safety supervisor, Mr. Carver, safety inspector for the industry, Mr. Quinn, its transfer and storage foreman, all of whom testified generally about cleanliness standards and the usual and prevailing conditions at the refinery; and finally, a Mr. Zimmerman, a pumper at the refinery, who testified that he was on shift at the time of the accident and that no cleaning up had been done while he remained on duty. The respondent railroad then called Mr. Sheets, also a pumper at the refinery, who testified that he relieved Mr. Zimmerman on the morning after the accident, and that he saw no cleaning up done from the time he came on duty to the time he observed an inspection team from the railroad examining the vicinity where the injury occurred. No objection was made at this time to any of these witnesses or to their testimony, none of them having been identified for the appellant in answer to his interrogatories.

The respondent called as the next witness, Charles F. Jeffries, a roadmaster for the railroad, who was to testify concerning an inspection he had made six or seven hours after the accident of the premises where the injury occurred. This testimony became relevant only after it was discovered, shortly before, that Mr. Sheets could testify that no changes were made in the condition of the premises from the time he relieved Mr. Zimmerman until he saw the inspection team of which Mr. Jeffries was a member. This was the position of the defense before these developments had been bifurcated, the respondent

taking the position that the appellant had slipped because of oil and that the oil had been quickly cleaned up after the accident or covered with sawdust by the refinery employees, whereas the refinery claimed that the premises were essentially clean at the time of Mr. Wolfe's injury. Thus, it was not until long after the trial had begun that the refinery and the respondent discovered that they could put together links that would connect in Mr. Jeffries' testimony.

As soon as Mr. Jeffries was called, counsel for the appellant asked for a conference with the court and opposing counsel outside the presence of the jury at which he objected to the calling of the witness on the grounds of surprise and moved that this testimony not be given before the jury. It was argued that the name of Mr. Jeffries had not been submitted to the appellant in fulfillment of the continuing obligation to supply names of persons possessed of relevant facts or of persons who investigated the accident. The motion to restrict the testimony was resisted by both counsel for the respondent railway company and the refinery for the reasons that there had been no pre-trial conference, wherein witnesses were agreed upon; nor was there any request by the appellant for a list of witnesses from Farmers Union; neither was there any showing that Mr. Jeffries was a person who had knowledge of "relevant" facts pertaining to the action, nor was he considered by the respondent an investigator who was assigned to gather information about and to settle the claim arising from the accident. Said counsel, "I must say that when I examined Mr. Halloran's Interrogatories I felt that it was appropriate to answer concerning the men who knew most about this accident, which was the train crew, it being noted that there were apparently no eye-witnesses to the accident. I am not sure in any case that the answer was not responsive; it had not been my contemplation to call Mr. Jeffries for this particular testimony, which of course is going to relate to his inspection, because I didn't believe that I could connect up the situation between the time of the accident and the time he went out to inspect, and this

was a development which actually took place during the course of this trial when some of these witnesses were for the first time interviewed. This is not an unusual situation, as I think the Court knows, one does not always anticipate every twist and turn of a case. I think the burden attempted to be cast by the interrogatories to alert Mr. Halloran to every twist or turn of the evidence as it may proceed is an unreasonable one. I do not feel that the defendant really had or has the burden with respect to this type of testimony coming in at this time, that is to alert him to every possible witness which the defense may have." The court indicated that upon a showing of surprise, "there can be a continuance," but was unsure under the circumstances of the case if the witness could be "entirely excluded" from testifying before the jury. After being informed that the testimony would relate to the condition of the premises and inasmuch as no continuance was requested by the appellant, the court finally concluded, "Well I will permit the witness to testify." Mr. Jeffries stated that he was responsible for the safety of the men working under him and that the "specific purpose of this inspection," was "to determine the condition of the area and make notes and report any findings or unsafe conditions that did exist." When asked about the presence of oil on the walkway, he testified only that, "there was oily spots on the walkway at various locations which were pretty well covered with sawdust, in fact I should say quite well covered with sawdust."

After these statements had been made, court and counsel again retired to chambers where the court entertained a motion to strike the testimony of Mr. Jeffries and of "any witness" called by the defense "not named in answers to Interrogatories." Counsel for the respondent reasserted the reasons he had previously given for allowing the testimony and commented further, "I think the Court in this case, even though it concludes that the Interrogatory was not precisely answered certainly has the power to exercise its discretion under Rule 60(b), to permit the testimony to stand. And I might add also

that it is the usual and customary practice of this Court in handling matters of this kind, that is to say in what witnesses are to be utilized at the trial, to do these things in pre-trial conference and our pre-trial order specifically calls for this type of thing to be settled in a pre-trial; plaintiff demanded no pre-trial but was anxious to proceed to trial and I believe that that actually was the proper place to settle this." After hearing further argument the court denied the motion to strike.

Throughout the remainder of the trial appellant continued to object that defense witnesses were surprise witnesses. Over this objection the court permitted the calling of Mr. Oblender, the thrust of whose testimony was to establish that the safest way to board a moving railroad car is to mount it at the leading end and not from the trailing end as Mr. Wolfe had attempted to do; and of Mr. Jordan, a railroad shopman, who identified and explained an exhibit of train wheels on rails which he had prepared. This exhibit, weighing nearly a ton, had been mounted on a truck and brought to the basement of the courthouse. Although it was not offered as evidence, the respondent asked that the jury be permitted to view it as a demonstration. The appellant objected that the jury might be misled because of possible variances between the constructed wheels and rails and the ones actually involved in the alleged accident. The court, nevertheless, allowed the jury to see the demonstration but limited the view to merely an observation of the relationship of the wheel to the rail.

After hearing appropriate instructions from the court, the jury deliberated and on April 10, 1964, returned its verdict for the respondent. Appellant moved for a new trial and after it was denied brought this appeal.

Appellant has asked us to consider whether the testimony of those witnesses called by the defense whose names were not disclosed in response to appellant's interrogatories should have been suppressed or removed from the jury's consideration by the trial court. Respondent does not resist the general proposi-

tions propounded by appellant, "namely, that interrogatories are continuing in their nature and that sanctions may in the proper case be imposed by the court" when a party fails to properly respond thereto; but argues that this is not a proper case for sanctions. We agree with respondent that under the circumstances of this case the trial was conducted in an impartial and expeditious manner. In ruling on the testimony the court protected the right of all parties to the action and enabled the jury to make a fair determination of the issues in dispute.

Rule 33, M.R.Civ.P., authorizing the use of interrogatories for purposes of pre-trial discovery from any "adverse party," although liberally construed to make all relevant facts available to parties in advance of trial and to reduce the possibilities of surprise and unfair advantage, Coca Cola Co. v. Dixi-Cola Lab., Inc., D.C., 30 F.Supp. 275, cannot become a weapon for punishment or forfeiture in the hands of a party, or an instrument for avoidance of a trial on the merits. The rule, in conjunction with other discovery and pre-trial procedures, has been designed a secure a just, speedy and inexpensive determination of actions, and to assure that a judgment be given on the facts as they actually exist. See generally, Wright, Discovery, 35 F.R.D. 39. Even though under Rule 37 sanctions may be imposed upon a party who fails to comply with the discovery requirements of the rules, and specifically upon a party who fails to properly answer interrogatories, necessarily it must lie within the authority of the trial judge to determine from the circumstances of each case what constitutes compliance and non-compliance and to determine what sanctions, if any, are to be imposed. A strict rule of exclusion could in many instances defeat the desired goal of a decision on the merits. Such a misfortune, we feel, may be avoided if we heavily rely upon the watchful eye of the trial judge whose vision normally is focused upon the delicate balance which weighs the server's right to demand answers to his interrogatories and the extent of the adverse party's compliance. In

interpreting these rules we will reverse the trial judge only when his judgment may materially affect the substantial rights of the appellant and allow a possible miscarriage of justice.

In reviewing Mr. Wolfe's claim of surprise and unfair advantage, we note that he limited his pre-trial preparation largely to the interrogatories upon the railroad. He made no attempt at any time to serve interrogatories upon the refinery, even after he knew that the refinery had been joined as a third-party defendant, that hostility existed between the respondent and the refinery, and that on the issue of the condition of the premises at the time of the injury the refinery was as to him an adverse party. Moreover, at the beginning of the trial when the positions of each of the defendants were explicitly stated and it was agreed that the refinery could produce evidence and cross-examine before the jury on the issue of the alleged debris, nothing was done by Mr. Wolfe's counsel to discover what knowledge the refinery might have of the condition of the premises at the time of the injury which the railroad did not have or if there were witnesses at the refinery unfamiliar to the railroad who knew of "relevant" facts concerning the action. It was only after the trial had reached a point where the defense had joined forces and the damaging testimony of Mr. Zimmerman and Mr. Sheets had been introduced, to which that of Mr. Jeffries merely added credence, that Mr. Wolfe's counsel began to object that respondent had not fully complied with his interrogatories. By that time the issues were well formulated, and it was the duty of the trial judge to make rulings on the evidence which would assure that all the facts were brought to the attention of the jury that a determination on the merits might be had. We sustain the trial judge in his judgment. We feel that he acted wisely and well, giving the appellant every opportunity to assert in what manner he had been prejudiced and to ask for a continuance if necessary. The liberal allowance for cross-examination assured the appellant every possible chance to test the credibility of every defense witness.

We reiterate that "[t]here is nothing mandatory about the discovery provisions of the Rules. On the contrary, the purpose and intent is evident throughout to leave their application to the discretion of the trial court—not, of course, an absolute discretion but one controlled and governed, not only by statutory enactments and the well established rules of the common law, but also by considerations of policy and of necessity, propriety and expediency in the particular case at hand." United States v. Kohler Co., D.C., 9 F.R.D. 289, as cited in 4 Moore's Fed.Prac. (2d ed.), p. 2260.

Appellant has asked us to consider also whether the trial court erred to his prejudice when it permitted the jury to view the demonstration of railroad wheels on railroad tracks merely to observe their relationship inasmuch as the demonstration was not offered into evidence and was not factually connected with the injury. Section 93-1201-1, R.C.M.1947, permitting utilization at trials of material objects for exhibits, demonstrations and experiments if the particular object "has such a relation to the fact in dispute as to afford reasonable grounds of belief respecting it," provides that these matters are to be regulated by the sound discretion of the trial judge. New York Life Ins. v. Gamer, 9 Cir., 106 F.2d 375; May v. Northern Pac. Ry., 32 Mont. 522, 81 P. 328, 70 L.R.A. 111. We hold as the Illinois Appellate Court held in Smith v. Ohio Oil Co., 10 Ill.App.2d 67, 134 N.E.2d 526, 58 A.L.R.2d 680 that "the determination of relevancy and explanatory value of demonstrative evidence is primarily within the discretion of the trial court, but, to curtail abuses, is subject to review as to the actual use made of the object. If it appears that the exhibit was used for dramatic effect, or emotional appeal, rather than factual explanation useful to the reasoning of the jury, this should be regarded as reversible error, not because of abuse of discretion, but because actual use proved to be an abuse of the ruling."

We are not persuaded that this limited inspection of these

mute objects resulted in prejudice to the appellant. Before the judge permitted the view it is clear from the record that he required a showing that identically gauged tracks and identically similar wheels as would be found on the particular type of tank car were used in constructing the exhibit. He explicitly limited the observation to the relationship of the wheel to the track, forbidding any discussion or argument to the jury while they were making their observations. He further cautioned the jury that the exhibit was not a "reproduction of the physical facts which existed at the time of the accident" and that the only purpose of the observation was to see the "relationship of a railroad wheel to the railroad tracks." In giving final instructions of law before sending the jury to deliberate he reiterated the essentials of appellant's claim that *parts or portions* of the hand were thrown on the rail and run over. We must remember that throughout the proceedings references were made to the hand being palm down on the track, that it was pulled from a mitten in its mangled condition, that the mitten remained on the track, and that certain creases on the mitten introduced as evidence by appellant were made by the wheel and the flange.

We do not know how much, if anything, the jury learned or could have learned from their inspection of the exhibit. However, in reaching a fair and just verdict it was incumbent upon them to know whether Mr. Wolfe was struck in the manner he alleged, and if so, how and where the impact of a rolling train wheel would be taken by a human hand lying palm down on the track. In resolving these questions of fact we cannot say that the jury were not aided by this exhibit or that they were misled by or misused the information it gave them. At least after their observations they were more familiar with the position of a wheel on a track and with what the flange of the wheel was. There can be no objection in principle to the jury seeing an object which will clarify testimony and enable them to form a more accurate opinion of the facts in dispute. See New York Life Ins. Co. v. Gamer, (9 Cir.), 106

F.2d 375, 378; Alston v. Shiver, Fla., 105 So.2d 785; Grenz v. Werre, N.D., 129 N.W.2d 681; Hogan v. Cooke Pontiac Co., Ky., 346 S.W.2d 529; Martindale v. City of Mountain View, 208 Cal.App.2d 109, 25 Cal.Rptr. 148; Owens v. Missouri Pac. Ry. Co., C.C., 38 F. 571; Greenberg v. City of Waterbury, 117 Conn. 67, 167 A. 83; Beisel v. Monessen S. W. Ry. Co., D.C., 121 F. Supp. 604; Dobbins v. Little Rock R. & Elec. Co., 79 Ark. 85, 95 S.W. 794, 9 Ann.Cas. 84; Finch v. W. R. Roach Co., 295 Mich. 589, 295 N.W. 324.

■ That this exhibit was not introduced into evidence does not disturb us. We note, as did the trial judge, the physical inconvenience of bringing the demonstration to the courtroom and in handling it as evidence, that the respondent was willing to offer it if the court desired, and that no objection that it was not introduced as evidence was made by the appellant during the trial. It is within the discretion of the trial court under section 93-1201-1 to apply the same procedure as is provided for a view of premises or property in litigation under section 93-5102 when it is felt that the object should be visited to be properly understood or that the jury would be aided thereby.

■ As a final challenge to the decision against him below appellant has asked us to consider whether he should have been granted a new trial on grounds that the verdict cannot be supported by the evidence and is against the law. Our policy is that when the trial court denies a motion for a new trial and thereby indicates faith in the jury's verdict we will act with veneration to that exercise of judgment. Campeau v. Lewis, 144 Mont. 543, 398 P.2d 960; In re Maricich's Estate, 145 Mont. 146, 400 P.2d 873; State Highway Comm'n v. Barovich, 142 Mont. 191, 382 P.2d 917. Our examination of the record will only be to determine if substantial evidence supports the verdict and judgment. Morton v. Mooney, 97 Mont. 1, 33 P.2d 262; West v. Wilson, 90 Mont. 522, 4 P.2d 469. It would be an "undue invasion of the jury's historic function for an appellate court to weigh the conflicting evidence, judge the

credibility of witnesses and arrive at a conclusion opposite from the one reached by the jury." Lavender v. Kurn, 327 U.S. 645, 66 S.Ct. 740, 90 L.Ed. 916.

Unfortunately for the appellant, as was pointed out in Healy v. Penn. R. Co. (3 Cir.), 184 F.2d 209 at 213, the Federal Employers' Liability Act does not make the railroad an insurer. See also Beisel v. Monessen S. W. Ry. Co., 3 Cir., 218 F.2d 273. As was said in Bailey v. Central Vermont Ry., 319 U.S. 350, 63 S.Ct. 1062, 87 L.Ed. 1444, by the United States Supreme Court, "Reasonable care and cause and effect are as elusive here as in other fields. But the jury has been chosen as the appropriate tribunal to apply those standards to the facts of these personal injuries. That method of determining the liability of the carriers and of placing on them the cost of these industrial accidents may be crude, archaic, and expensive as compared with the more modern systems of workmen's compensation. But however inefficient and backward it may be, it is the system which Congress has provided. To deprive these workers of the benefit of a jury trial in close or doubtful cases is to take away a goodly portion of the relief which Congress has afforded them." Consequently, the burden is on the claimant to prove his allegations to the jury.

Our review of the evidence shows that there were no eyewitnesses to this injury, that, with the exception of the statements by Mr. Wolfe, the testimony does not establish precisely the condition of the premises at the time of the accident, and that there was considerable doubt whether Mr. Wolfe received his injuries in the manner he alleged. We find that the evidence warrants the verdict and that it is not contrary to the law.

We affirm the verdict and judgment.

MR. CHIEF JUSTICE JAMES T. HARRISON and MR. JUSTICES DOYLE, ADAIR and CASTLES concur.