No. 91-598

IN THE SUPREME COURT OF THE STATE OF MONTANA

1992

FILED

DEC 22 1992

Ed Smith
CLERK OF SUPREME COURT
STATE OF MONTANA

IN THE MATTER OF

H.D., a Youth in Need of Care.

APPEAL FROM: District Court of the Thirteenth Judicial District,
In and for the County of Carbon,
The Honorable Maurice R. Colberg, Judge presiding.


COUNSEL OF RECORD:

For Appellant:

Gary L. Spaeth, Spaeth Law Firm,
Red Lodge, Montana

For Respondent:

Hon. Marc Racicot, Attorney General, Michael S.
Wellenstein, Assistant Attorney General,
Helena, Montana; A. W. "Tony" Kendall, Carbon
County Attorney, Red Lodge, Montana

Guardian Ad Litem:

Damon L. Gannett, Gannett & Ventrell,
Billings, Montana

Submitted on Briefs: July 2, 1992

Decided: December 22, 1992

Filed:

Clerk

Justice Terry N. Trieweiler delivered the opinion of the Court.

This is an appeal from the judgment of the District Court of the Thirteenth Judicial District, Carbon County, declaring H.D. a youth in need of care and granting temporary custody to the Department of Family Services for a period of one year. H.D.'s father appeals. We affirm.

Appellant raises the following issues:

1. Did the District Court abuse its discretion when it declared H.D. a youth in need of care and ordered temporary care, custody, and control of H.D. be awarded to the Department of Family Services of the State of Montana for a period of one year?

2. Did the District Court err when it retained jurisdiction throughout the custody hearings?

3. Did the District Court err when it denied the motion by H.D.'s father to compel discovery responses from the State?

H.D. was born on May 31, 1985. H.D.'s natural mother and father were divorced three years later and the court awarded the father custody of both H.D. and her brother, N.D. H.D.'s father has been her primary caretaker since 1988.

In early June 1990, H.D.'s father moved with his two children and his fiance, O.D., from California to Red Lodge, Montana. Shortly thereafter, the father and O.D. were married.

The Montana Department of Family Service's (DFS) first contact with H.D.'s family arose during a custody dispute in 1988 between H.D.'s father and her natural mother, L.D. L.D. alleged that the father sexually abused H.D. Similar allegations were also made by

2

O.D. in 1990 during a divorce proceeding between O.D. and H.D.'s father.

H.D. has been in the physical custody of the DFS since November 24, 1990. On December 10, 1990, the DFS filed a petition for temporary investigative authority of H.D. and her brother, N.D. The District Court granted the DFS's petition relative to H.D., however, denied the request as it pertained to N.D.

A guardian ad litem was appointed for H.D. On February 22, 1991, the DFS petitioned for temporary legal custody of H.D. As of the date of the petition, H.D. was a resident of Carbon County, Montana. Hearings on the DFS's petition were held on March 13, 1991, April 15 and 16, 1991, and May 15, 1991. At the time of the temporary custody hearings in 1991, H.D. was five years old.

Four professionals, including a physician, two clinical psychologists, and a licensed social worker, testified at the temporary custody hearings. All four were qualified to testify as experts in the areas of child abuse and child sexual abuse. All four of them concluded that H.D. was a victim of sexual abuse.

The two psychologists expressed the opinion that H.D. was seriously damaged emotionally. They testified that H.D. was in need of mental health intervention and recommended that she undergo professional, individual therapy. The other experts agreed therapy was necessary. The experts also concurred that H.D.'s father should undergo therapy.

In addition to hearing from the expert witnesses, the District Court listened to other witnesses familiar with H.D.'s situation.

The court viewed a video deposition of H.D., considered 21 nude photographs of H.D. taken by her father and natural mother, and listened to evidence that H.D.'s father had physically abused O.D. in the presence of his children.

After considering the testimony and evidence, the District Court entered its Findings of Fact and Conclusions of Law and Order. In its order dated July 16, 1991, the court concluded that H.D. "is abused and neglected and is therefore a Youth in Need of Care within the meaning and definitions of Sections 41-3-102(2) and (11) M.C.A." Finding that H.D.'s health is harmed or threatened by acts or omissions of her father, the court ordered that H.D. be removed from her father's care and placed in the custody of the DFS for a period of one year. The father appeals from this judgment.

I

Did the District Court abuse its discretion when it declared H.D. a youth in need of care and ordered temporary care, custody, and control of H.D. be awarded to the Department of Family Services of the State of Montana for a period of one year?

Before modifying the rights of a parent and awarding temporary custody of a child to the DFS, the district court must adjudicate the child to be a "youth in need of care." Section 41-3-406(1), MCA. Section 41-3-102(11), MCA, defines "youth in need of care" to be a child who is dependent, abused, or neglected. According to § 41-3-102(2), MCA, an abused or neglected child means:

> [A] child whose normal physical or mental health or welfare is harmed or threatened with harm by the acts or

4

omissions of his parents or other person responsible for his welfare. [Emphasis added.]

Section 41-3-102(3), MCA, provides that "harm to a child's health or welfare" includes the harm that occurs whenever the parent commits sexual abuse or allows such abuse to be committed against the child.

When we consider a trial court's award of temporary custody pursuant to § 41-3-406, MCA, the ruling of the court is presumed correct. It will not be reversed by this Court unless there is (1) a mistake of law, or (2) a lack of substantial credible evidence to support the findings amounting to an abuse of discretion. *Matter of T.A.* (1991), 249 Mont. 186, 190, 814 P.2d 994, 997; *Matter of S.P.* (1990), 241 Mont. 190, 194, 786 P.2d 642, 644.

The father contends the District Court clearly abused its discretion by finding H.D. a youth in need of care. Specifically, the father argues that no direct evidence exists to prove he sexually abused his daughter.

First of all, we note that it was not necessary that the DFS prove H.D. had been sexually abused by her father. It was sufficient to show that H.D.'s mental health or welfare was harmed by her father's acts or his "omissions." There was substantial evidence from four different experts revealing that H.D.'s mental health had been damaged while her father was responsible for her. Second, there was also evidence that H.D. was sexually abused by her father. However, that finding was not a prerequisite to a conclusion that H.D. was a youth in need of care.

5

At the hearings, each expert witness testified that H.D. had been sexually abused. Dr. Patrick J. Sauer's determination was based on discussions with H.D., as well as observations of the young girl. Dr. Sauer testified that H.D. told him that both Bob Lee (a former boyfriend of H.D.'s mother) and her father had touched her chest and vagina. Dr. Sauer explained that when he asked H.D. how her breasts were touched, H.D. provided him with a spontaneous, visual demonstration. Dr. Sauer determined that the spontaneity of the demonstration gave weight to H.D.'s testimony.

Dr. Donna Veraldi, clinical psychologist and expert witness, testified that H.D.'s behavior was characteristic of a sexual abuse victim. Her conclusion was based on a personal interview with H.D., formal tests she administered for H.D., and the reports of other professionals who examined H.D. Specifically, Dr. Veraldi attested that H.D. exhibited symptoms and suffered from post-traumatic stress disorder. She defined this disorder as "an emotional and often physiological re-experiencing of a traumatic event." According to Dr. Veraldi, H.D. experienced nightmares and bed wetting--particularly around times of visitation with her father. H.D. also exhibited a sense of foreshortened future and avoidance of discussing traumatic events. Dr. Veraldi further explained that H.D.'s behavior deteriorated when she asked her to discuss "the touching and her father." This deteriorating behavior, testified Dr. Veraldi, was consistent with a child who has been sexually abused.

6

Ed Lambrecht, licensed social worker for the DFS who conducted the investigation concerning H.D., testified that his interviews with H.D. led him to conclude H.D. was sexually abused.

Dr. Tranel, a psychologist, was called as an expert witness by the father. After reviewing H.D.'s video deposition and a taped interview of H.D. by Mr. Lambrecht, Dr. Tranel testified that he was convinced that H.D. was exposed to sexually inappropriate conduct. He testified that, in his opinion, H.D. had been abused by her primary caretaker or someone in her family constellation. Dr. Tranel explained that:

> All of [H.D.'s] problems are generated by a solar milieu, a family constellation, an environment that is lacking in a lot of healthy features, security, stability, and consistency, and probably oversexualized activity, including the strong possibility of sexual abuse.

Dr. Tranel concluded that the abuser was one of H.D.'s primary caretakers. The record reveals that since the dissolution in 1988, H.D. had lived with her father and he was her primary caretaker.

In addition to expert testimony, the court viewed H.D.'s video deposition. H.D. testified that her father had touched her on "her bottom" and on her breasts. She told others so that he would stop touching kids, and she did not want to live with her father.

Both psychologists, Dr. Veraldi and Dr. Tranel, determined H.D. to be emotionally abused and in need of mental health intervention. Dr. Tranel testified that H.D. is "seriously emotionally disturbed." He indicated that without professional, individual therapy, H.D. may develop, in the long term, multiple

personalities as a result of the sexual abuse she has experienced. Dr. Veraldi expressed the opinion that H.D. suffered from post-traumatic stress disorder. Both Dr. Veraldi and Mr. Lambrecht recommended that H.D. not be returned to her father's custody.

In making its decision to modify the father's parental rights, the court relied on a combination of the testimony of four expert witnesses, a video deposition of H.D., a series of nude photographs of H.D., and evidence of physical abuse by H.D.'s father against his ex-wife, O.D., in the presence of his children. Additionally, the court based its decision in part on the father's choice not to provide as evidence the results of a court-ordered psychological evaluation of the father. The court's findings and conclusions were supported by substantial credible evidence. We find no abuse of discretion by the District Court.

## II

Did the District Court err when it retained jurisdiction throughout the custody hearings?

As his second issue on appeal, H.D.'s father contends that the court's jurisdiction expired on March 15, 1991, and that after such time, the court was without authority to make a determination concerning the custody of H.D. He maintains that each and every time the court provided for a continuation of protective services for his daughter after March 15, 1991, it did so without authority. Consequently, the father argues that his daughter should be returned to him.

8

On February 22, 1991, the DFS petitioned for temporary custody of H.D. Due to a conflict in schedules, the original hearing date of March 5, 1991, was rescheduled until March 13, 1991. The parties agreed that the temporary investigative authority and protective services granted to the DFS on December 10, 1990, and originally set to expire on March 10, 1991, would remain in effect until March 15, 1991.

At the end of the March 13, 1991, temporary custody hearing, the District Judge ordered the proceedings to continue on April 15, 1991. He also ordered conditions in existence under the temporary investigative authority order of December 10, 1990, to remain in effect until further order of the District Court.

Further hearings were conducted on April 15 and 16, 1991. At the conclusion of those hearings, the court ordered, until the next hearing, the continuation of the same December 10, 1990, temporary investigative and protective service arrangements pertaining to H.D.

The final hearing occurred on May 15, 1991. The same arrangements were continued once again until the court issued its findings of fact and conclusions of law and order on July 16, 1991.

H.D.'s father has offered no statutory authority for his argument that, once granted, investigative authority cannot be continued by further order of the court. We decline to impose limitations, based on the facts of this case, that were not imposed by the legislature.

We conclude that in ordering a continuation of protective services of H.D., the District Court acted at all times pursuant to statutory authority. Section 41-3-403, MCA, entitled "Order for immediate protection of youth," gives the trial court authority to provide for immediate protective services. Upon the filing of a petition for temporary investigative authority and protective services, § 41-3-403(2)(g), MCA, permits the court to grant as relief "such other temporary disposition as may be required in the best interest of the youth."

Subsection (2)(g) of § 41-3-403, MCA, is applicable in the present case. It authorized the District Court to use broad power to make continuing arrangements for H.D.'s protection.

III

Did the District Court err when it denied the father's motion to compel further discovery responses from the State?

On March 22, 1991, after the first hearing was continued, the parties exchanged formal requests for discovery. H.D.'s father submitted written interrogatories and requests for production to the DFS. Responses were provided by the DFS on April 1, 1991.

On April 9, 1991, six days before the continued hearing date, H.D.'s father moved the court to compel further answers to his interrogatories numbered 1, 2, and 3. Those interrogatories basically asked the DFS to identify its expert witnesses and the substance of their testimony. They also requested that the DFS specify in detail the basis for its petition and identify the witnesses who would testify to those details. In response to those

10

interrogatories, the DFS identified the expert witnesses who would be called to testify and provided records setting forth the results of their examinations and investigation. The father was referred to the records for further information.

The District Court denied the father's motion for the reasons that it considered the answers adequate under the circumstances; there was not adequate time prior to trial to provide for the detailed kind of supplemental responses sought by the father; and since the same witnesses had been identified long ago, the father had some obligation to interview them and determine the substance of their opinions on his own.

The District Court has inherent discretionary power to control discovery and that power is based upon the court's authority to control trial administration. *Massaro v. Dunham* (1979), 184 Mont. 400, 404, 603 P.2d 249, 251. In judging whether a party has failed to properly answer interrogatories, "necessarily it must lie within the authority of the trial judge to determine from the circumstances of each case what constitutes compliance and non-compliance . . . ." *Wolfe v. Northern Pac. Ry.* (1966), 147 Mont. 29, 40, 409 P.2d 528, 534. "[W]e will reverse the trial judge only when his judgment may materially affect the substantial rights of the appellant and allow a possible miscarriage of justice." *Wolfe*, 409 P.2d at 534.

The father has not shown that the court's ruling prejudiced his case. To the contrary, the record reveals that the court

11

administered the discovery process fairly. The DFS provided the father with a substantial amount of documentation which would enable him to understand the reasons for the DFS's petition and the nature of the evidence the DFS would present. Additionally, the DFS gave the father the names of all the witnesses it planned to call at trial. The father was free to interview the named witnesses to discover their opinions in greater detail.

We conclude that the District Court did not abuse its discretion when it denied appellant's motion to compel discovery.

The judgment of the District Court is affirmed.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____
Justices

12

December 22, 1992

## CERTIFICATE OF SERVICE

I hereby certify that the following order was sent by United States mail, prepaid, to the following named:

Gary L. Spaeth
Spaeth Law Firm
P.O. Box 1361
Red Lodge, MT 59068

Hon. Marc Racicot, Attorney General
Michael S. Wellenstein, Assistant
Justice Bldg.
Helena, MT 59620

Damon L. Gannett
Gannett & Ventrell
175 No. 27th St., No. 1306
Billings, MT 59103

A. W. "Tony" Kendall
Carbon County Attorney
P.O. Drawer U
Red Lodge, MT 59068

ED SMITH
CLERK OF THE SUPREME COURT
STATE OF MONTANA

BY: _____
    Deputy