# THE SVEND.

### RICHARDS and others *v.* HANSEN.

*(Circuit Court, D. Massachusetts. November 24, 1879.)*

COMMON CARRIERS BY WATER—EXCEPTIONS IN BILL OF LADING.—Exceptions in a bill of lading against breakage, leakage and rust, as well as the perils of the sea, do not relieve a carrier from liability where a cargo of iron was injured by salt water, owing to improper stowage and the defective construction of the vessel.

CLIFFORD, J. Carriers of goods, if common carriers, contract for the safe custody, due transport and right delivery of the same, and, in the absence of any legislative regulation prescribing a different rule, are insurers of the goods, and are liable at all events and for every loss or damage, unless it happened by the act of God, or the public enemy, or the fault of the shipper, or by some other cause or accident expressly excepted in the bill of lading, and without any fault or negligence on the part of the carrier. *The Cordes,* 21 How. 23. Ship-owners and masters of ships employed as general ships in the coasting or foreign trade, or in general freighting business, are deemed common carriers by water, and as such are as much insurers of the goods they transport as common carriers by land, unless it is otherwise provided in the bill of lading. Story on Bailments, (7th Ed.) 501. . Such a carrier's first duty, and one implied by law, is to provide a seaworthy vessel, tight and staunch, and well

furnished with suitable tackle, sails or other motive power, as the case may be, and furniture necessary for the voyage. Vessels so employed must also be provided with a crew adequate in number, and sufficient and competent to perform the required duty, and with a competent and skilful master of sound judgment and discretion. Owners in such cases must see to it that the master is well qualified for his situation, as they are directly responsible for his negligences and unskilfulness in the performance of his duty. In the absence of any special agreement to the contrary, the duty of the master extends to all that relates to the lading and stowage of the cargo, as well as to the transportation and delivery of the goods, and for the performance of all those duties the ship is liable, as well as the master and owners. *Elliott* v. *Russell*, 10 John. 7; *King* v. *Shepherd*, 3 Story, C. C. 349; Abbott on Ship. (8th Ed.) 478. Goods of great value, consisting of sheet iron in bundles, were shipped by the libellants in the steamer Svend, bound on a voyage from the port of Liverpool to the port of Boston. By the manifest it appears that the steamer was an iron propeller, carrying general cargo for freight, and that the shipments belonged to various persons, which, of itself, is sufficient to show that the master and owners were common carriers in the strictest sense. Sufficient also appears to show that the goods, when shipped, were in good order and condition, and that the covenant of the bill of lading is that they shall be delivered in like good order and condition. One thousand bundles of the shipment, stowed in the forward part of the aft lower hold, were badly wet with salt water to such an extent that, when the bundles were hoisted out to be delivered, the water dripped out of the same and appeared muddy with rust. Damages are claimed by the libellants, in the libel as amended, for breach of the contract to deliver the goods in the condition specified in the bill of lading in the sum of four thousand dollars, and the evidence shows that the goods shipped were injured in the manner charged to an amount even greater than that alleged in the libel. Compensation for the injury is claimed by the libellants upon the following grounds:

*First.* Because the evidence proves to a demonstration that the goods were shipped in good order and condition, and that the respondents have failed to show that the injuries to the goods resulted from the excepted perils, or any of them, or from the fault of the shipper.

*Second.* Because the steamer was unseaworthy in that she was not of a construction suitable to carry such a cargo on such a voyage at that season of the year.

*Third.* Because the ceiling of the steamer was not of a suitable character, nor fit to protect such cargo from salt water on the described voyage.

*Fourth.* That the goods injured were not properly stowed or dunnaged for their protection against injuries of the kind on such a voyage.

Two points are not controverted in argument by the respondents:

*First.* That the goods were in good order and condition when shipped.

*Second.* That the quantity mentioned in the libel was injured in the course of the voyage, and that it was not in good order and condition when delivered.

Conceded or not, the evidence to that effect is satisfactory and conclusive, but the respondents explicitly deny every other proposition submitted by the libellants, and insist as follows:

*First.* That the burden of proof is upon the libellants to prove that the injury to the goods did not result from the excepted perils.

*Second.* That the steamer was in all respects seaworthy, and of suitable construction and equipment to transport such a cargo on such a voyage at that season of the year.

*Third.* That the ceiling of the ship was sufficient, and that the goods were properly stowed and dunnaged.

Hearing was had in the district court, and the district court entered a decree dismissing the libel, from which decree the libellants appealed to this court. Since the appeal was entered here more than sixty witnesses have been examined by the parties, which renders it necessary to review all the

findings of the court below, as well as the legal principles applied in disposing of the case.

Due shipment of the goods is not denied, nor is it controverted that the steamer sailed from Liverpool, March 24, 1873, and that she arrived at Boston, her port of destination, April 14, in the same year. Certain exceptions are contained in the bill of lading. At the time of the voyage the steamer was comparatively a new vessel, it appearing that she was built in October of the previous year. Competent expert witnesses in great numbers describe the construction of the steamer under deck as low-waisted forward of the poop, and express the opinion that she was unfit to make such a voyage during the winter months. They were asked to give the reasons for that conclusion, and answered to the effect that in such a construction as that described the tendency in rough weather would be to fill the waist with water, and to cause the vessel to strain and roll deep and heavy. When asked what effect the straining of the vessel would have upon her ceiling in the lower hold, the answer was that if the vessel labored heavily it would cause her to blow; that the deeper the ship rolls the higher she will blow the water in her bilge, particularly if her ceiling is not water-tight. Sheet iron, all agere, is quite susceptible to damage from being wet, and some of the expert witnesses testify that a drop of sea water will damage a sheet of the iron, and that it would take very little water to go through a whole package of such merchandise. Apart from the construction of the steamer, including her ceiling, no attempt is made to show that she was unseaworthy. Beyond doubt, she was comparatively new, and was staunch and strong. Nor is it pretended that the damage to the cargo resulted from any defects in the hull of the vessel or in her equipment, beyond what is embraced in the charge that her construction in the particulars mentioned exposed the vessel to unusual strain in bad weather, and tended to make her roll unusually deep and heavy.

Argument to show that the vessel, when she rolls deep and heavy, is more likely to blow and expose cargo stowed in her aft lower hold to wet, is quite unnecessary, as the conclu-

sion accords with all experience, and is fully established in this case by the evidence, unless the ceiling of the ship is water-tight. Owners of vessels of such a construction, even though they are seaworthy in the general sense, are bound to furnish such appliances for the protection of the cargo so stowed as will protect it from injury arising from the ordinary perils of navigation. Damage to cargo, occasioned by salt water, does not come within the excepted perils when, by reason of the place in which it is stowed, it is exceptionably liable to such injury in severe weather. *The Oguendo*, 38 Law Times, (N. S.) 151. Ship-owners, by such a bill of lading, contract for safe custody, due transport, and right delivery of the goods, in like good order and condition as when they were shipped; and it is universally admitted that the contract implies that the ship is reasonably fit and suitable for the service which the owner engages to perform; that she is, and shall continue to be, in a condition to encounter whatever perils of the sea a ship of the kind, laden in that way, may be fairly expected to encounter in the contemplated voyage. Safe custody is a part of the contract, and if, in consequence of the peculiar construction of the ship, further appliances are necessary to protect the cargo from injury by ordinary perils, not excepted in the bill of lading, the duty of the owner is to furnish all such; and if he fails to do so he is responsible for the consequences. *The Marathon*, 40 Law Times, (N. S.) 163. Explicit exceptions may excuse imperfections of construction or repairs, but, in the absence of express words to the contrary, a bill of lading, in the usual form, implies a warranty of seaworthiness when the voyage begins, and all the exceptions in it must, unless otherwise expressed, be taken to refer to a period subsequent to the sailing of the ship with the cargo on board. As for example: Wheat was shipped at New York for Scotland, under a bill of lading excepting perils of the seas, however caused. During the voyage the wheat was damaged by sea water. In an action by the holders of the bill of lading against the owners of the ship, the jury having found that the water obtained access to the cargo in consequence of one of the ports being insuffi-

ciently fastened, the subordinate court entered a verdict for the ship-owners, upon the ground that the loss was covered by the exception in the bill of lading. But the House of Lords, on appeal, reversed the judgment, and held that as in order to bring the loss within the exceptions it must be found that the ship sailed with the port in a seaworthy state, a new trial must be had, it not appearing that that fact had been found by the jury. *Steel* v. *State Line Steamship Co.* 37 Law Times, (N. S.) 333; *Lyon* v. *Mells*, 5 East. 428.

Two defects are suggested in the steamer, both of which, if they be defects, existed at the time the ship sailed:

*First.* That the construction of the ship, as already explained, rendered her unfit to transport such a cargo on such a voyage at that season of the year.

*Second.* That the ceiling of the ship, in view of her peculiar construction, was not sufficient to protect such cargo from damage by salt water in such a voyage during the winter months of the year, when rough weather may reasonably be expected.

Rough weather, as all experience shows, may be expected on such a voyage in the winter and early spring months of the year, but the respondents deny that the construction of the steamer rendered her unfit to transport such goods on such a voyage, and insist that her ceiling was properly constructed and sufficient to protect such cargo, in the place where it was stowed, from damage by salt water, and from every peril within the contract of the bill of lading. When built the steamer was ceiled with a permanent ceiling up to her deck. It is claimed by the respondents that she had during the voyage, in addition to that, a temporary ceiling up to the turn of the bilge, but the evidence, taken as a whole, does not sustain that theory of fact. Even the master testifies that "she was ceiled all the way up to the deck," but he says nothing about any such additional temporary ceiling as that supposed by the respondents. Surveyors examined the steamer in New York, and one of them speaks of the vessel as ceiled to the deck, but makes no mention of any temporary ceiling of any kind. Proof that the steamer had no

such ceiling is also derived from the statements of the consignee, who testifies that he went down into her hold after she was discharged, and he states that she was ceiled from the keelson entirely up to the deck. Nor does he say a word about any additional ceiling. Ships carrying grain frequently have what is called a grain ceiling, in addition to the ordinary permanent ceiling, which usually extends only to the upper turn of the bilge. Unlike that, a grain ceiling is a temporary appliance built up as dunnage to keep the grain removed from the permanent ceiling. Support to the theory of the respondents that the steamer had such temporary ceiling for the protection of the cargo in question is derived chiefly from the testimony of the head stevedore, who superintended the discharge of the cargo, and the fact that the steamer, on her former voyage from Odessa to Falmouth, for orders, carried a cargo of wheat, which was delivered without injury.

Beyond all doubt, the evidence shows that the damage was caused by salt water, which came in contact with the bundles of sheet iron as they lay stowed in the aft lower hold; and it is equally clear that the water must have reached the iron in large quantities to have caused such extensive damage to one thousand bundles of the iron, estimated to weigh 55 tons. Cargo stowed in the same hold, above the bundles of sheet iron, came out in good condition; and the witnesses for the respondents agree that there had been no leakage through the hatches, from which it would seem to follow that the water must have come from below.

Confirmation of that view, of a persuasive character, is derived from the testimony of the master, who in direct terms attributes the damage to the blowing of bilge-water through the seams of the ceiling in the after hold when the steamer rolled. Cogent support to that theory is also derived from the testimony of the mate, who expresses the opinion that it was caused by the ship laboring so heavily and rolling. Convincing confirmation of that theory, if more be needed, is also found in the testimony of Port Warden Paine, who testified that when he went down into the after hold he did not see

anything that denoted a leak, and he expressed the opinion that it must have been done by what is called blowing—that is, that the bilge-water swashes up when the ship rolls; and he added that it is a common thing for bilge-water to blow up when the ship labors, as explained, and that it does not take much water to damage sheet iron. Few steamers have their ceiling caulked so as to be water-tight, and in all cases where they do not it seems that the blowing of bilge-water through the seams of the ceiling is a common occurrence when the vessel rolls. Steamers, as well as sail ships, roll more or less on every such voyage, varying in degree with the state of the wind, the construction of the vessel, the manner in which she is loaded, and the means by which she is propelled. Even suppose that cases may arise where it would properly be held that blowing is a peril of navigation, within such an exception in a bill of lading, it is clear such a rule cannot be applied in this case, as it appears that the goods might have been protected from such damage by a reasonable foresight, care and prudence, the rule being that the carrier ought to take adequate measures to protect the cargo against a common and ordinary occurence which might and ought to have been foreseen. *Bearse* v. *Ropes*, 1 Sprague, 332.

Dangers of the seas, said Judge Story, whether understood in its most limited sense as importing only a loss by the natural accidents peculiar to that element, or whether understood in its more extended sense as including inevitable accidents upon that element, must still in either case be clearly understood to include only such losses as are of an extraordinary nature, or arise from some irresistible force or some overwhelming power which cannot be guarded against by the ordinary exertions of human skill and prudence. *The Reeside*, 2 Sum. 571. Hence it is that, if the loss occurs by a peril of the sea that might have been avoided by the exercise of any reasonable skill or diligence at the time when it occurred, it is not deemed to be in the sense of the phrase such a loss by the perils of the sea as will exempt the carrier from liability. Story on Bailments, (7th Ed.) § 512*a*; *Nugent* v. *Smith*, Law Rep. 1 C. P. D. 437; 3 Kent's Com. (12th Ed.)

217.  Both parties agree that the steamer was well built, and
that in the general sense she was seaworthy when the voyage
began and when it ended at the port of destination, the only
defect alleged by the libellants being that in consequence of
her peculiar construction and the insufficiency of her ceiling
and dunnage, she was unfit to carry sheet iron stowed in her
aft lower hold on such a voyage during the winter and early
spring months of the year; and the court is of the opinion
that the great weight of the evidence fully sustains that prop-
osition.  It may be that the steamer would have been a fit
and proper vessel to carry such cargo on such a voyage in a
milder season of the year, or that she would have been a fit
and proper vessel for the voyage in question if her ceiling had
been water-tight, or if the sheet iron had been stowed be-
tween decks; but it is very clear, in the judgment of the court,
that the construction and defective ceiling of the steamer,
taken in connection with the place and manner of stowage,
rendered her unfit to transport such goods on such a voyage
at that season of the year.  By the terms of the bill of lading
safe custody is as much a part of the contract of the carrier
as due transport and right delivery.  When shipped the sheet
iron was in good order and condition, and when delivered it
was badly damaged by salt water, the evidence showing to
the satisfaction of the court that the water obtained access to
the goods through the seams or crevices in the ceiling of the
steamer.

Evidence of leakage is not exhibited in the record, and in-
asmuch as it is proved that the cargo stowed above the iron
in the same hold came out dry, it seems clear, almost to a
demonstration, that if the ceiling had been water-tight no
such damage would have been occasioned, and that the swash-
ing of the bilge-water between the sides of the vessel and the
ceiling would not have caused it to reach the sheet iron,
though stowed in the aft lower hold.  Where goods are shipped
and the usual bill of lading given, promising to deliver the
same in good order, the dangers of the seas excepted, without
more, and they are found to be damaged, the *onus probandi* is
upon the owners of the vessel to show that the injury was

occasioned by one of the excepted perils. *Clark* v. *Barnwell*, 12 How. 272; Story on Bailments, (7th Ed.) § 529; *Nelson* v. *Woodruff*, 1 Black, 156. Reported cases, however, may be found where it is held that if an excepted peril is shown which is adequate to have occasioned the loss, the burden of proof shifts, and that the shipper, in such a case, is required to show that it was not occasioned by that peril, but by some negligence of the carrier, which rendered that peril efficient, or co-operated with it, or brought it about without any connection with the sea peril. *The Invincible*, 1 Lowell, 226; *The Lexington*, 6 How. 384. Such ship-owners, carrying goods under a bill of lading by which they contract to deliver the goods in good order and condition, certain perils excepted, are bound to deliver the same in that condition unless prevented by those perils, and are responsible for any damage to the goods occasioned otherwise than by those perils. *The Chasca*, 32 Law Times, (N. S.) 838. Three marine surveyors examined the steamer after her return, and concur in the opinion that she was not fit for such a voyage, at that season, in view of her construction and consequent tendency to roll and produce blowing in a heavy sea, and many other witnesses are of the same opinion. Her internal construction was such that bilge-water could blow into the hold through the seams of her ceiling when she rolled, it appearing that her ceiling was built upon the ribs of the ship, beginning at the keelson, only 14 inches above her iron bottom, and that it continued all the way up to her main deck, being only about four inches away from her iron sides, which shows that bilge-water might rush up between the ceiling and her iron sides whenever the ship rolled, as there is no evidence to show that the seams of the ceiling were caulked or pitched before she sailed, or at any time during the voyage. Defects of the kind might easily have been remedied before the voyage began, or at any time during its progress; but it does not appear that any attempt was made to apply any of the known remedies for such defects. Stowage in the lower hold may be a fit place even for such a cargo in a steamer of a different construction, and doubtless might have been in the steamer

of the libellants if the ceiling had been water-tight, or if proper means had been devised and applied to prevent the bilge-water, when the vessel rolled, from blowing or escaping through the seams of the ceiling, and finding access to the sheet iron as stowed in the hold. Suitable appliances, it is not doubted, would have prevented such consequences, and protected the cargo from damage. Nothing of the kind was done or attempted, and, in view of the exposed condition of the cargo from the causes shown, the conclusion must be that the place where the same was stowed was an unfit place, in that steamer, for stowing such cargo on such a voyage at that season of the year.

Defences of various kinds are set up in argument, of which the two principal ones deserve to be specially examined:

*First.* That the bill of lading excepts leakage, breakage and rust; the language of the instrument being "not answerable for leakage, breakage or rust."

*Second.* That the damage was caused by the perils of the seas, within the meaning of the bill of lading.

1. Two or more answers may be made to the defence, arising from the said exception:

*First.* It is not adequate to have occasioned the loss. Rust may be cause by sweat or mere moisture of the air in the place where goods are stowed, and it may be that the exception is adequate to cover such a loss, and in such a case to shift the burden of proof from the carrier to the shipper, to show that the loss was not occasioned by that peril.

*Second.* Concede that, but it by no means follows that such an exception is adequate to cover the damage in this case, which arose from the profusely wetting and soaking the sheet iron in salt bilge-water, blown through the seams and crevices of the ceiling on the sides of the place where the iron was stowed. Viewed in the light of the actual circumstances, it is clear that the exception is neither adequate nor sufficiently comprehensive to cover the damages occasioned by the means proved in this case.

*Third.* Suppose, however, it may have the effect to shift the burden of proof, still it does not follow that the defence

is a valid one, as it fully appears that the evidence introduced by the libellants is sufficient to overcome every presumption in favor of the carrier, and to show that the damage was occasioned by mere want of foresight, care and diligence.

2. Nor is there any better ground to support the second defence. Evidence to support the defence was introduced in the court below, consisting of the depositions of the master, mate and engineer of the steamer, and the protest filed in the case; and those documents are exhibited in the record, together with the depositions of nineteen other witnesses taken since the appeal, of which sixteen were introduced by the libellants. Ships carrying cargoes as common carriers must be fitted to encounter ordinary sea perils on the voyage described in the contract of shipment. Injuries to cargo resulting from such perils give the shipper a right of action against the carrier, but the court below, on the evidence then exhibited, found that the gales were proved to be of extraordinary violence, and such as would have been likely to damage a seaworthy ship, and to come within the usual definition of such perils. Responsive to that, the first observation to be made is, that the gales referred to did not damage the steamer of the respondents in the slightest degree worth mentioning, as appears from all the testimony exhibited as to her condition after she arrived at her port of destination. Except that the muzzle around the end of the pipe under the ceiling broke loose, there is no proof of actual damage to the steamer, and it is not claimed that the expenses of repairing that injury would amount to more than a nominal sum. Witnesses called by the respondents, especially the officers of the steamer, sustain the theory of the respondents that the gales which the steamer encountered were extraordinary, but in view of the very slight damage to the vessel, and the contradictory testimony introduced by the libellants since the appeal, the court is of the opinion that the violence of the gales was much exaggerated in the testimony of the officers as introduced in the court below. *The Oguendo,* 38 Law Times, (N. S.) 151. Opposed to the theory of the respondents that

the damage was occasioned by the extraordinary perils of the
seas, is the united testimony of the sixteen witnesses since
introduced by the respondents.   Suffice it to say, without
reproducing their testimony, that they are witnesses of great
nautical experience, and that they all testify in substance and
effect that the weather, even as described by the master, was
not more boisterous than is usually found on that voyage at
that season of the year.   Eight steamers coming westward
over the same route as the steamer of the respondents, start-
ing at different times later, overtook and passed her at various
points on her course, and encountered only moderate weather,
and made very good passages as to time.   On the other hand,
steamers which left a week earlier than the steamer of the
respondents encountered severe and heavy weather, such as
is to be expected and is usually experienced during the winter
and early spring months.   Inquiry was made of the master
whether or not there was any unusual wind or weather dur-
ins the voyage, and his answer was, "We had very heavy
gales, sir, but I could not say it was an unusual thing to
have, except at that season, being so far advanced."

Examined in the light of the whole evidence, the court is of
the opinion that the respondents have failed to show that the
damage was occasioned by the perils of the seas within the
meaning of the bill of lading.   Much testimony was intro-
duced by the respective parties in regard to the dunnage of the
sheet iron stowed in the lower hold.   Dunnage usually con-
sists of pieces of wood placed against the sides and bottom of
the hold of the ship, to protect the cargo from injury by con-
tact with the vessel or other cargo, or by leakage.   Confined
to that purpose, the court is of the opinion that the weight of
the evidence shows that it was sufficient, but if its purpose be
extended as a means to protect the cargo stowed in the hold
from being wet by bilge-water blown through the seams and
crevices of a defective ceiling, the court is of the opinion that
it was clearly insufficient to afford any such sufficient protec-
tion.   Conclusive proof is exhibited that the ceiling was not
water-tight, and all the witnesses examined upon the subject,
except the head stevedore and one of his assistants, have

given evidence tending to convince the court that the salt water obtained access to the sheet iron through the ceiling. Testimony to the contrary comes chiefly from the stevedore, but his statements are so indefinite, contradictory, rash and inconsiderate, that they fail to secure the concurrence of the court in their accuracy. Beyond controversy the damage to the sheet iron was occasioned by blowing, by which is meant that the salt bilge-water found access to the iron, as stowed in the forward part of the after hold, through the seams and crevices of the ceiling, when the vessel rolled; from which it follows that the libellants are entitled to recover, and that the decree must be reversed. Separate findings of fact and law are required in an admiralty suit in the circuit court in all cases where the amount in controversy, on appeal, is sufficient to give the supreme court jurisdiction to re-examine the decree rendered in the circuit court; but where the sum or value in dispute does not exceed the sum or value of $5,000, a more general finding of those matters in the opinion of the circuit court will be sufficient. 18 St. at Large, 315, § 1; 316, § 3; *1265 Vitrified Pipes,* 14 Blatch. 279.

Prior to the filing of the answer the libellants filed an amendment to the libel, increasing the *ad damnum* to $4,000, and inasmuch as the respondents made no objection to the amendment it is deemed proper to regard it as having been duly allowed, as otherwise it would be allowed by this court. On June 16, 1876, the libellants asked leave to file a second count as an amendment to the libel, and the court ordered it placed on file, reserving the question of its allowance or disallowance to be decided at the final hearing. Pursuant to that order the amendment, as proposed, is allowed, but the additional amendment proposed at the argument, further increasing the *ad damnum,* is disallowed. Evidence as to the extent of the damage is contained in the record, and in view of that fact it is not necessary to refer the cause to a commissioner to ascertain the amount, the court being satisfied that the loss exceeds even the amended *ad damnum* of the libel, which is all the court can allow under the pleadings, except for costs which have arisen through the

fault of the respondents in not paying the just claim of the libellants. *The Wanata*, 5 Otto, 600, 612.

Decree of the district court is reversed, and a decree for the libellants entered for the sum of $4,000, with costs.