No. 12140

IN THE SUPREME COURT OF THE STATE OF MONTANA

1973

---

BILL AND FAY HAYNES,

              Plaintiffs and Appellants,

     -vs-

COUNTY OF MISSOULA et al.,

              Defendants and Respondents.

---

Appeal from:  District Court of the Fourth Judicial District,
              Honorable Jack L. Green, Judge presiding.

Counsel of Record:

    For Appellants:

        Christian, McCurdy, Ingraham and Wold, Polson, Montana
        Douglas J. Wold argued, Polson, Montana
        Stanley M. Doyle, Polson, Montana
    For Respondents:

        Garnaas, Hall and Riley, Missoula, Montana
        J. Robert Riley argued, Missoula, Montana
        Garlington, Lohn and Robinson, Missoula, Montana
        Sherman V. Lohn argued, Missoula, Montana
        Robert L. Deschamps, III argued, County Attorney, Missoula,
         Montana

---

                                  Submitted:  September 13, 1973

                                  Decided: DEC 10 1973

Filed: DEC 10 1973

*Thomas J. Kearney*
                                    Clerk

Mr. Justice Frank I. Haswell delivered the Opinion of the Court.

Plaintiffs secured a jury verdict in the amount of $80,650 for the loss of two horses in a fire at the Missoula County fairgrounds in August 1967, and judgment was entered thereon. Subsequently the district court of Missoula County, the Honorable Jack L. Green, district judge, granted defendants Missoula County and its Fair Board a new trial. From the order granting defendants a new trial, plaintiffs appeal.

Plaintiffs are Bill and Fay Haynes, the owners of two registered quarter horses destroyed in the fire and American Livestock Insurance Company, a material damage carrier. American paid the Hayneses $5,000 for the loss of one of the two horses involved and became subrogated to the Hayneses' claims against defendants to the extent of such payment. Defendants are Missoula County and its Fair Board, the operators of the Western Montana Fair. The fairgrounds where the fire occurred are owned by Missoula County and located within the Missoula city limits.

A general factual background of this action is necessary for an understanding of the issues involved in this appeal.

Defendant Missoula County Fair Board has operated the Western Montana Fair as agent of Missoula County for a number of years. In 1967 the fair was held August 23 through August 26.

Sometime prior to the fair date, the Board sent by mail to prospective exhibitors a letter, a premium book, and an entry blank containing a general release. The Hayneses completed the entry blank and Mrs. Haynes signed the general release form and returned the form to the Fair Board. The premium book also contained a general release clause purporting to release the Missoula County Fair Board from liability for loss or damage to exhibits. The Hayneses had exhibited horses at the Missoula County fair in previous years, and in 1967 they exhibited two horses---Jule Bar, a stallion, and his yearling son, Jule's Dandy. Both were registered

quarter horses. The Hayneses' horses were assigned stall space in barn number two and pursuant to the premium book regulations the feeding, watering and grooming was left to the exhibitor.

One of the Hayneses' horses was entered in the halter classes and the barrel racing event. Bill Haynes had been hired by the Fair Board to work as arena director for the 1967 fair. The tasks of arena director required the use of a saddle horse.

At approximately 4:00 a.m. the morning of August 24, 1967, a fire of unknown causes erupted in barn number two which resulted in the death of both the Hayneses' horses.

Hayneses filed suit against defendants on October 24, 1967, to recover damages for the loss of their two quarter horses, Jule Bar and Jule's Dandy. Considerable time elapsed and two substitutions of judges occurred before trial. During that time, the American Livestock Insurance Company, material damage carrier on one of the horses, was added as party plaintiff. This insurer had paid the Hayneses $5,000, the face of the policy, for the loss of one of the two horses.

A complex and extended jury trial began in the district court of Missoula County in May 1971, before Judge Jack L. Green. On May 27, 1971, the jury returned a general verdict for plaintiffs and awarded damages in the amount of $80,650; $1,000 of which was for the loss of the horse Jule's Dandy and the remainder for the loss of the horse Jule Bar. The jury also returned a special interrogatory in which it found that the care, custody and control of the two horses was in the Missoula County Fair Board. A flurry of post-trial activity occurred, culminating in the granting of defendants' amended motion for a new trial on June 18, 1971. From the order granting defendants a new trial, plaintiffs appeal.

The basic theory of plaintiffs' case was that defendants breached their duty of ordinary care owing to plaintiffs, thereby rendering them negligent; that such negligence on defendants' part

was the proximate cause of the destruction of plaintiffs' horses and the resulting monetary damages represented the value of the two horses at the time of loss. Specific acts of negligence alleged covered both acts of commission and omission on the part of defendants and involved the hazardous condition of the building, a fireworks display and failure to provide adequate fire protection.

Evidence at the trial discloses many conflicts. Principal conflicts involved the cause of the fire; in whose care, custody and control the horses were at the time of loss; and the value of the horses at the time of loss.

On the evening of August 23, 1967, Rich Company, a fireworks display company under contract to the Fair Board, exploded fireworks. Several witnesses testified concerning small grass fires which were ignited by the fireworks. Plaintiffs' witness, Meredith E. Fite, the Missoula Fire Marshal, testified that in his opinion "the probable cause of this fire would have been the fireworks." Mr. Fite stated that during the testimony of the plaintiffs' other witnesses he had formed the opinion the fire had started in the sawdust accumulated outside the building, had slowly burned under the sill, and erupted inside the building at 4:00 a.m.

Defendants' witness, Thor Fladwed, a professional fire investigator with experience in insurance cases, testified that he had performed tests on material samples taken from barn number one and from the fire area. He stated that in his opinion the chain of causation stated by Mr. Fite was practically impossible.

One witness for defendants stated that he saw a bright blue flash on the morning of the fire which could have been an electrical failure, but plaintiffs produced a Montana Power Company employee who testified there had been no transformer power surge or similar malfunction the night of the fire.

Witnesses for the defendants also suggested the possibility of arson, accident, or a nearby trash barrel as possible causes of the fire. Plaintiffs' expert Fite stated he had ruled out these various possible causes of the fire.

The Fair Board kept no fire trucks within the premises of the fairgrounds. Three night watchmen were on duty in the fairgrounds on the night of the fire. At about 4:00 a.m. watchman Cassidy observed smoke coming from barn number two. He and watchman Cambridge went to barn number two and commenced releasing horses from their stalls. Watchman Brennan called the city fire department. Persons who were sleeping in campers and trailers adjacent to barn number two awoke and took part in attempting to release horses from the barn. Some horses had been padlocked in their stalls. The fire swept through the barn very rapidly and several horses, including those owned by the Hayneses were killed in the fire. The Hayneses were not on the fairgrounds the night of the fire.

Plaintiffs' five witnesses who testified as to the market value of the horse Jule Bar varied in their opinions between $30,000 and $105,000. Plaintiff Bill Haynes testified the value of the horse Jule's Dandy was $1,000. A defense value witness valued Jule Bar at $7,500. The jury returned a verdict awarding damages of $79,650 for the loss of Jule Bar, and $1,000 for the loss of Jule's Dandy.

Following entry of judgment for plaintiffs, the trial court granted an amended motion for a new trial filed by defendants. The amended motion listed six of the eight statutory grounds provided in section 93-5603, R.C.M. 1947, upon which a new trial may be granted:

(1) Irregularity in the proceedings and abuse of discretion by the trial court which prevented defendants from having a fair trial.

(2) Accident or surprise which could not be guarded against.

(3) Excessive damages given under the influence of passion or prejudice.

(4) Insufficiency of the evidence to justify the verdict.

(5) Error at law occurring at trial.

(6) Misconduct of the jury.

The trial court's order granting the amended motion was general and did not specify on which of these enumerated grounds the new trial was granted.

On appeal this Court rendered an opinion on May 31, 1973, affirming the trial court's order granting defendants a new trial which was subsequently withdrawn and a rehearing granted. The present opinion follows.

The underlying issue in this appeal is whether the trial court abused its discretion in granting defendants' amended motion for a new trial.

At the outset we observe that the granting of a new trial is within the sound discretion of the trial court and its order granting a new trial will be reversed only for manifest abuse of that discretion. Garrison v. Trowbridge, 119 Mont. 505, 177 P.2d 464; Maki v. Murray Hospital, 91 Mont. 251, 7 P.2d 228. An order, general in its terms, granting a new trial will be upheld if it can be sustained on any ground stated in the motion therefor. Tigh v. College Park Realty Co., 149 Mont. 358, 427 P.2d 57.

The first ground enumerated in defendants' motion for a new trial is irregularity of the proceedings and abuse of discretion by the trial court whereby defendants were prevented from having a fair trial. Defendants contend the district court's pretrial order suppressing plaintiffs' general release in the Western Montana Fair entry blank is reversible error. Specifically defendants argue that this release is a valid and enforceable contract absolving defendants from liability.

The release at the bottom of the entry blank provided:

- 6 -

"I hereby release the Missoula County Fair Board
from any liability by loss, damage or injury to
livestock or other property, while said property
is on the Fairgrounds."

According to the deposition of plaintiff Fay Haynes, she signed the entry blank for both plaintiffs and was authorized to do so. Prior to trial, the district court first denied plaintiffs' motion to suppress the release, but subsequently granted the motion and suppressed the release.

We hold the district court was correct in suppressing the release. In our view the release is illegal and unenforceable because it is contrary to the public policy of this state and against the public interest.

Initially we note the general proposition that even though a particular exculpatory agreement is not invalidated by statute, its enforcement may be contrary to public policy or to the "public interest" and such agreement is often invalidated thereby. See: 57 Am Jur 2d, Negligence, §24, p. 368; Anno. 175 A.L.R. 8, §3, pp. 14,15; Tunkl v. Regents of the University of California, 60 Cal.2d 92, 32 Cal.Rptr. 33, 383 P.2d 441, 6 ALR3d 693. A good statement of this general proposition and its scope is found in Anno. 6 ALR3d 704, §2, p. 705:

"The general rule is that persons may not
contract against the effect of their own
negligence and that agreements which attempt
to do so are invalid. However, it is not true
that any agreement of this kind is void as
against public policy. Whether a person can
relieve himself by agreement from the duties
attaching as a matter of law to a legal rela-
tionship created by contract between himself
and another person, is a matter of some diffi-
culty. The conclusion has been reached that
even under the view that a person may, under
some circumstances, contract against the per-
formance of such duties, he cannot do so where
either (1) the interest of the public requires
the performance of such duties, or (2) because
the parties do not stand upon a footing of equal-
ity, the weaker party is compelled to submit to
the stipulation."

Attempts by fair associations to deny responsibility or liability for damages to or loss of articles delivered for exhibition on the basis of exculpatory clauses in contracts or fair regulations have consistently been denied effectiveness as against a showing of negligence. Anno. 139 ALR 931; Kay County Free Fair

- 7 -

Asso. v. Martin, 190 Okla. 225, 122 P.2d 393; French Republic v. World's Columbian Exposition, 83 F. 109, reversed on other grounds 91 F. 64. This applies equally to injury to animals, Moeran v. New York Poultry, Pigeon and Pet Stock Asso.(loss of cat entered in a pet show) 59 N.Y.S. 584; Coltart v. Winnipeg Industrial Exhibition (loss of dog by disease contracted from other entries in dog show) 17 Western Law Reporter 372, appeal denied in 4 Dominion Law Reports 108.

Directing our attention to Montana law, we note an express public policy of this state to fix responsibility for damage to person or property upon those who fail to exercise ordinary care or skill. Section 58-607, R.C.M. 1947, provides:

"Every one is responsible, not only for the result of his willful acts, but also for an injury occasioned to another by his want of ordinary care or skill in the management of his property or person, except so far as the latter has, willfully or by want of ordinary care, brought the injury upon himself. The extent of liability in such cases is defined by the title on compensatory relief."

The purpose of this statute is twofold: (1) To fix primary responsibility and liability on the tortfeasor whose conduct occasioned the loss or injury, and (2) to make the victim whole.

Section 13-801(2), R.C.M. 1947, defines illegal contracts as those:

"Contrary to the policy of express law, though not expressly prohibited."

Section 49-105, R.C.M. 1947, provides:

"Any one may waive the advantage of a law intended solely for his benefit. But a law established for a public reason cannot be contravened by a private agreement."

In our view the foregoing statutes are broad enough to render illegal any exculpatory clause or release relieving a potential tortfeasor from all liability for future negligent conduct where such clause or release is contrary to public policy or against the public interest.

A distinction must be observed btween exculpatory clauses, releases, or disclaimers of liability in contracts on the one hand;

and indemnity agreements, "hold harmless" agreements, indemnity bonds or insurance on the other. The former deny the victim any redress by cancelling liability altogether, while the latter leave liability unimpaired but shift the ultimate incidence of the loss to others. The public policy distinctions between the two types are illustrated in this excerpt from Diamond Crystal Salt Company v. Thielman, (CCA 5 1968), 395 F.2d 62, 65:

> "Appellants seek to compare the 'release' here involved to a contract of liability insurance. There is obviously no comparison. The law allows one to purchase liability insurance as a matter of sound public policy. Such insurance is a contract of indemnity whereby a person may be indemnified for liability arising from his own negligence. The first and most obvious distinction is that such contracts involve the legal relations of three persons rather than just two. The significant distinction, however, is that such contracts attempt to guarantee that the person injured as a proximate result of the negligence of the insured will be compensated for such injuries, whereas enforcement of the contract in the instant case would have just the opposite result of denying an injured person the right to be compensated for injuries proximately caused by another's negligence." (Emphasis added).

For an extensive discussion of the differences and distinctions between exculpatory clauses and indemnity agreements see Jamison v. Ellwood Consolidated Water Company, (CCA 3, 1970) 420 F.2d 787, 789,790.

Unlike exculpatory clauses and releases, ordinarily "Contracts of indemnity purporting to relieve one from the results of his failure to exercise ordinary care are not contrary to public policy." General Accident Fire & Life Assurance Corp. v. Smith & Oby Co., (CCA 6 1959) 272 F.2d 581, 77 ALR2d 1134,1139. The case of Ryan Mercantile Co. v. Great Northern Ry. Co., (D.C. Mont. 1960) 186 F.Supp. 660, aff'd (CCA 9, 1961), 294 F.2d 629, furnishes an example of a valid indemnity agreement between landlord and tenant concerning injuries to third persons on the leased premises, including a requirement that the tenant carry liability insurance for the landlord's protection. Ryan is clearly distinguishable from the instant case on this basis, among others.

Our ultimate inquiry here then is whether the "release" is contrary to public policy or against the public interest and accordingly invalid and unenforceable.

We hold the County is precluded from disclaiming liability by virtue of the release when performing an act in the public interest. This principle is recognized in Restatement, Contracts, §575, providing in pertinent part:

> "(1) A bargain for exemption from liability for the consequences * * * of negligence is illegal if
>
> "(a) * * *
>
> "(b) one of the parties is charged with a duty of public service, and the bargain relates to negligence in the performance of any part of its duty to the public, for which it has received or been promised compensation."

This rule is also recognized as the majority holding in the United States in Tunkl v. Regents of the University of California, 60 Cal.2d 92, 32 Cal.Rptr. 33, 383 P.2d 441, 6 ALR3d 693, where a more definitive test of "public interest" was propounded. There a contract was signed by a patient upon admission to defendant's nonprofit charitable hospital which purported to release the hospital from liability for negligent acts of its employees. The California Supreme Court held the contract invalid because it affected the public interest. The Court went on to state that the "public interest" factor will invalidate an exculpatory clause where some or all of the following characteristics are present:

1. It concerns a business of a type generally suitable for public regulations;

2. The party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public;

3. The party holds himself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards;

4. As a result of the essential nature of the service, in the economic setting of the transaction, the party in invoking

exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services;

5.  In exercising a superior bargaining power, the party confronts the public with a standarized adhesion contract of exculpation and makes no provision whereby a person may pay additional reasonable fees and obtain protection against negligence; and

6.  As a result of the transaction, the person or property of the purchaser is placed under the control of the party to be exculpated, subject to the risk of carelessness by the latter.

A majority, and arguably all, of these tests are met in the instant case. Where, as here, the County is performing a public service, underwritten in part by public funds, it is chargeable with using ordinary care in the interest of public safety and a release clause exempting it from liability for negligence is contrary to public policy, against the public interest and therefore invalid and unenforceable. In our view the fact that plaintiffs here were exhibitors rather than spectators renders this principle no less applicable.

Directing our attention to the second ground contained in defendants' amended motion for a new trial, viz. accident or surprise which ordinary prudence could not have guarded against, defendants have two contentions:  (1) that plaintiffs' proof in midtrial tending to show that care, custody, and control of the horses was in the county, suddenly placed the attorney for one of the County's insurers in a position adverse to the County, effectively depriving the County of its substantial right to representation by counsel, and (2) the district court's denial of admission in evidence of defendants' premium book containing the rules and regulations of the fair prevented defendants from having the complete transaction between the parties with respect to custody and responsibility for the horses placed before the jury.

In analyzing the County's first contention, the background and events must be understood.

The controlling circumstances are reasonably clear: At the time of the loss the County was insured with two carriers, Phoenix and Northwestern. The Phoenix policy did not cover losses to property "in the care, custody and control of the named insured". The Northwestern policy had no such exclusion, but did have a $25,000 deductible provision. From the inception of the loss each company had a separate attorney providing a defense to Missoula County for claims arising from the fairgrounds fire of August 24, 1967.

On October 4, 1968, the County was notified by Phoenix that its policy might not provide coverage for the loss because of exclusion from coverage of property "in the care, custody and control of the insured". Through the pleading stage and all pretrial discovery as well as the trial itself, the County was aware that the Phoenix policy might not provide coverage for the loss but chose not to associate other counsel to represent its interests in this potential conflict. In the middle of the trial, testimony was introduced on behalf of plaintiffs tending to prove that care, custody and control of plaintiffs' horses was in fact in the County thereby bringing the Phoenix policy exclusion into play. Hence the letter of May 19, 1971, from Phoenix to the County advising of the "new development", i.e. introduction of evidence indicating the County's custody of the horses and bringing the Phoenix exclusion into operation.

This was no surprise that reasonable prudence could not have guarded against. The County was warned of the exclusion and the possibility of noncoverage almost two and one-half years before trial. The issue was presented in the pleadings and pretrial order. The County was also represented throughout by counsel for Northwestern, which had no such exclusion in its policy.

Defendants' second contention is likewise without merit. The significance of the premium book to defendants lies in the rules and regulations therein with respect to possession and custody of the horses stabled on the fairgrounds and on the issue of bailment.

The premium book also contained exculpatory disclaimers of liability for losses to animals by the County. The disclaimers were repeatedly refused admission in evidence on the same basis that the release in the entry blank was denied admission in evidence. At no time did the County offer in evidence the rules and regulations of the fair without the inadmissible exculpatory disclaimers. As the offered exhibit as a whole was inadmissible because of the tainted exculpatory disclaimers therein, the district court was correct in refusing its admission. How this ruling could surprise defendants in midtrial and affect their defense of contributory negligence which was pleaded and sovereign immunity which was not escapes us.

The third ground for granting a new trial contained in defendants' amended motion alleges excessive damages awarded by the jury by reason of passion and prejudice. Defendants argue the testimony of plaintiffs' value witnesses is all tainted by personal acquaintance and interest in the outcome of the litigation.

The various witnesses who testified concerning the value of the horse Jule Bar expressed opinions ranging from a high of $105,000 to a low of $7,500. The jury brought in an award of $79,650 for Jule Bar. The amount of this verdict is not so grossly out of proportion to the loss as to shock the conscience and authorize our intervention. On the contrary, it is supported by substantial credible evidence of a number of witnesses giving the basis and reasons for their respective valuations. Any interest some of them may have had in the outcome of the litigation by reason of personal relationships, prior ownership, or otherwise, was fully brought out on cross-examination. Under such circumstances the amount to be awarded as damages was properly left to the jury. Franck v. Hudson, 140 Mont. 480, 373 P.2d 951; Panisko v. Dreibelbis, 113 Mont. 310, 124 P.2d 997.

The fourth ground assigned by defendants as authorizing a new trial was insufficiency of the evidence to justify the verdict.

Defendants contend that the testimony of Fire Marshal Fite that the fire was caused by a fireworks display at the fairgrounds was based on conjecture and suspicion rather than substantial evidence. We have examined his testimony and find that it contains substantial credible evidence sufficient to support a finding by the jury that the fire was caused by the fireworks.

The fifth ground on which defendants sought a new trial was errors in law occurring at the trial and excepted to by defendants.

Defendants first contend that their motion for summary judgment at the commencement of the trial was erroneously denied in that plaintiffs admitted they were not aware of the exact cause of the fire and plaintiffs' pleadings did not bring the case within the doctrine of res ipsa loquitur. Suffice it to say that whether nor not plaintiffs knew the exact cause of the fire is immaterial to their allegation that the County was negligent in failing to provide adequate fire protection.

Second, defendants contend the district court committed reversible error in refusing to declare a mistrial during voir dire examination of prospective jurors by plaintiffs' counsel. Two questions were asked of the panel. The first question inquired as to whether any of the panel were stockholders, officers, agents or employees "of an insurance company engaged in the casualty insurance business". There was no objection to this question by defendants; no prospective juror indicated he was. The second question simply broadened the scope of the original question to include members of the prospective jurors' immediate families. At this point defendants moved for a mistrial on the basis of both questions, contending that the questions were not limited to the particular insurance company that was a party plaintiff in the case and that particular insurance company was not a casualty insurance company but a material damage carrier. The trial court denied the motion for mistrial but advised counsel "that there can be no more general questions on insurance" but

that "if you want to ask questions concerning the specific company which is a party plaintiff, I will permit it." The record discloses no further questions concerning insurance.

As a general rule if counsel acts in good faith, he may question prospective jurors on voir dire respecting their interest in, or connection with liability insurance companies. See: Anno. 4 ALR2d 761,792, et.seq. for an exhaustive listing of authorities in support. The rationale behind this general rule as indicated by these cases is that every litigant is entitled to a fair and impartial jury; that to secure this right, counsel for a litigant is entitled to question prospective jurors for the purpose of determining any bias or prejudice on their part; that one of the sensitive areas of juror bias and prejudice relates to the existence or nonexistence of insurance, particularly liability insurance; and accordingly counsel for a litigant is entitled to a reasonable latitude in voir dire examination to expose any such bias or prejudice on the part of a prospective juror and to enable a litigant intelligently to exercise his challenges, limited only by considerations of good faith.

Such rule and its rationale become compelling in a case where an insurance company is a named party to the litigation. Montana, inferentially at least, observes the distinction with respect to voir dire examination of prospective jurors in cases involving an insurance company as a party and those cases in which it is not. See: Meinecke v. Intermountain Transp. Co., 101 Mont. 315, 55 P.2d 680; Wilson v. Thurston Co., 82 Mont. 492, 267 P. 801. The cases cited and quoted by defendants (Avery v. City of Anaconda, 149 Mont. 495, 428 P.2d 465; D'Hoodge v. McCann, 151 Mont. 353, 443 P.2d 747) are distinguishable on this basis and accordingly inapplicable to the instant case.

The fact that the two questions were not limited to plaintiff insurance company, but covered any insurance company engaged in the casualty insurance business is not significant in this case. Although technical usage within the insurance industry may distinguish between

a casualty insurance company and a material damage carrier, the term in common usage has a generic meaning encompassing both. Where the reference to insurance leaves in doubt whether the reference is to liability insurance or to plaintiff's or defendant's insurance, courts are inclined to regard the reference to insurance as relatively harmless. 4 ALR2d 819 and cases cited therein.

In our opinion the circumstances of this case simply indicate a good faith effort by counsel for plaintiffs to inquire into a legitimate area of concern by two general questions to the panel as a whole. As such this matter furnishes no ground for a new trial.

Defendants next contend the trial court's ruling permitting Fire Marshal Fite to testify as an expert witness on the cause of the fire after repeated assurances by plaintiffs' counsel that they had no expert witness on the cause of the fire was error, which was not cured by the continuance granted defendants to meet this proof. The trial judge adequately protected the rights of the County by granting it a recess from May 18 to May 26 for the purpose of securing rebuttal testimony and preparing for cross-examination of Fire Marshal Fite. Plaintiffs' expert was deposed by both counsel for the County; their cross-examination of plaintiffs' expert was thorough and complete; they obtained a rebuttal witness with outstanding qualifications who contradicted plaintiffs' expert as to the cause of the fire; and, the County did not further complain to the court. Accordingly the trial judge did not abuse his discretion in permitting Fire Marshal Fite to testify as an expert witness on the cause of the fire. Wolfe v. Northern Pac. Ry. Co., 147 Mont. 29, 409 P.2d 528.

Next defendants contend the district court erred in ruling that defendants could not inquire of plaintiffs' value witness Parker as to the price he paid for Sugar Bars, the sire of Jule Bar. The district court refused the testimony after determining that the Sugar Bars sale was not a comparable market sale. We find no error here.

Defendants assign the trial court's permitting Fire Marshal Fite to testify as an expert witness on the possible or probable cause of the sawdust fire was error. An expert witness may be qualified by professional, scientific or technical training, or have practical experience in some field or activity conferring upon him a special knowledge not shared by mankind in general, and one who has been engaged for a reasonable time in a particular profession, trade, or calling will be assumed to have the ordinary knowledge common to persons so engaged. Nesbitt v. City of Butte, 118 Mont. 84, 163 P.2d 251. The opinion of a witness on a material question of science, art or trade in which he is skilled is admissible in evidence. Section 93-401-27, R.C.M. 1947. The determination of the qualification of a skilled or expert witness is a matter largely within the discretion of the trial judge, and in the absence of a showing of abuse, ordinarily will not be disturbed. Graham v. Rolandson, 150 Mont. 270, 435 P.2d 263; Nesbitt v. City of Butte, supra.

In the instant case Fire Marshal Fite testified he had served a total of 17 years as a fireman in the Missoula fire department, 4 as fire marshal, 4 as assistant fire marshal and 4 years as fire inspector; that he had attended 6 seminars on fire and arson investigation; he had completed a 100 hour fire and arson investigation course from Investigating Institute in Chicago; that he had assisted in planning the state of Montana Arson School in 1970. In the schools he had attended he studied fire investigation, arson, explosions, evidence, interviewing witnesses, photography, collection and preservation of evidence and determination of origin of fires. His duties included the investigation of all fires in which the Missoula fire department had been involved during his term of employment. During that time he investigated two sawdust fires. Although his experience with regard to fires relating to sawdust and shavings was quite limited, we consider it hypertechnical to require classification of an expert to that extent.

Certainly he had general experience and specialized training as an expert investigator of fire origins that set him apart from the layman. On this basis he was qualified to testify and the trial judge correctly permitted him to do so. The degree of his qualifications and the weight to be given his opinions are for the jury. Graham v. Rolandson, supra.

Defendants next contend the district court committed error in permitting plaintiffs to reopen their case in chief for the purpose of establishing the value of the second horse Jule's Dandy after dismissing the count relating to that horse. The transcript shows the following ruling:

> "THE COURT: Well, I will grant the motion to dismiss the count seeking damages for Jules Dandy for the reasons stated, and I will also grant the Plaintiffs' motion for leave to reopen their case in chief as to damages for Jules Dandy."

Plaintiffs then called plaintiff Bill Haynes who testified that the market value of Jule's Dandy at the time of loss was $1,000; the defense then presented Mr. Peltz as a rebuttal witness. The jury returned a verdict of $1,000 for Jule's Dandy.

We observe the error of which defendants complain was at most a technical error not affecting the substantial rights of the parties and therefore harmless. The trial judge's intention to permit plaintiffs to reopen their case to supply an element of proof they had overlooked was clear and within his discretion, notwithstanding his failure to specifically reinstate the count seeking damages for Jule's Dandy. Had the trial judge not intended to reinstate the count, there would be no purpose in permitting reopening and proof of value of Jule's Dandy. In any event it furnishes no basis for granting a new trial.

Defendants contend that the court's refusal on three occasions to admit the "premium book" containing the rules and regulations was reversible error. They argue that the entire premium book should have been admitted in evidence to show the complete transaction between plaintiffs and defendants entirely aside from the admissibility of the exculpatory disclaimer of liability contained therein. They point out that the rules and

regulations in the premium book disclose that there is no requirement that exhibitors must apply for stall space or stable their horses on the fairgrounds; that the owners of the horses and not the Fair Board were responsible for the care, feeding and safety of the horses; and that there was no delivery of possession of the horses and no acceptance thereof by the Fair Board and consequently no bailment.

This issue has been previously answered herein under defendants' contention of surprise. We simply repeat that at no time did defendants offer the rules and regulations contained in the premium book without the inadmissible exculpatory disclaimer of liability so the trial court's ruling thereon was correct.

The final ground contained in defendants' amended motion for a new trial relates to alleged misconduct of the jurors. Defendants argue that the jury adopted the forbidden "quotient method" in arriving at its verdict and point to the affidavit of juror Charles Johnson in support.

This affidavit falls far short of establishing a quotient verdict. The vice of a quotient verdict is an agreement in advance by the jurors to establish the amount of the verdict by taking individual juror's views as to the correct amount, adding them together, and dividing by twelve. Great Northern Ry. Co. v. Benjamin, 51 Mont. 167, 149 P. 968. The verdict is not objectionable where there is no previous agreement to be bound by the quotient process. Bracy v. Great Northern Ry. Co., 136 Mont. 65, 343 P.2d 848, cert.den. 361 U.S. 949, 80 S.Ct. 403, 4 L ed 2d 381. Here, the affidavit contains no statement of an advance agreement nor of averaging the individual juror's figures.

For the foregoing reasons none of the grounds enumerated in defendants' amended motion for a new trial authorizes the granting of a new trial. Accordingly, the order of the trial court granting defendants a new trial is vacated and set aside

and the jury verdict in favor of plaintiffs in the total amount of $80,650.00, and the judgment entered therein are reinstated.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____
Justices

_____
Hon. L. C. Gulbrandson, District
Judge, sitting for Justice Wesley
Castles.